THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RANDALL BATCHELOR, Defendant-Appellant.

First District (6th Division)   No. 1—87—3618

Opinion filed August 17, 1990.

Randolph N. Stone, Public Defender, of Chicago (Paul D. Bellendir, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and Sara Dillery Hynes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

Following a jury trial, defendant Randall Batchelor was found guilty of murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) and sentenced to a term of 35 years.

On appeal, he contends that: (1) the State racially discriminated during jury selection; (2) the court made rulings which denied defendant a fair trial by (A) limiting defendant's opening statements and cross-examination, (B) limiting defendant's impeachment efforts, and (C) allowing a photo of the dead victim to go to the jury; (3) the court improperly gave instructions on accountability; (4) the State made improper remarks in closing; (5) the court refused to send the jury additional instructions; and (6) the court improperly sentenced defendant to 35 years' imprisonment. We affirm.

On February 16, 1986, Batchelor, his codefendant Ricky Walls, and Tyrone Bufkin were walking in the vicinity of 101st and Luella in Chicago. A .38 caliber revolver was fired and Bufkin was killed.

The following facts are undisputed. One witness told police he had seen the three boys together shortly before the shooting and that Batchelor had a gun. Two other witnesses told police they had seen three people, had heard shots, and had seen two people flee. After the shooting, Walls and Batchelor went to the home of Charles Joseph. Both Joseph and his cousin William Johnson were present and later testified that Batchelor told them he had shot a boy. Batchelor left a gun at the Joseph home. Later the police recovered bullets from Bufkin's body which matched bullets from that gun.

Defendant was tried twice. At the first trial, the State introduced a confession by Batchelor, and the defense argued that the confession was the product of police coercion. That trial ended with a deadlocked jury and a mistrial.

At the beginning of the second trial, the judge told the jury that the indictment charged both Ricky Walls and Randall Batchelor with the murder of Tyrone Bufkin. He further explained that the defend-

ants were being tried separately for legal reasons. Shortly afterward, the court granted the State's motion to exclude Ricky Walls from the courtroom.

Dr. Mitra Kalelkar, deputy medical examiner for Cook County, described the findings of her autopsy on Bufkin including the location of four entrance wounds and the identification of two bullets recovered from his body. She gave her expert opinion that Bufkin died of multiple gunshot wounds.

Batchelor testified in his own defense and stated that, on the night of the killing, he was walking Tyrone Bufkin home with codefendant Ricky Walls lagging behind. When they reached the corner of 101st and Luella, Walls asked Bufkin why he had "flipped" (joined another gang). Bufkin replied that he hadn't and, besides, what did Walls plan to do about it. At that point, Batchelor testified, Walls pulled out a gun and started shooting. Batchelor fled with Walls to the home of Charles Joseph.

In the defense closing, counsel suggested that Ricky Walls was in command on the night of the killing and that witnesses Joseph and Johnson had been intimidated by Walls. Defense counsel also showed the jury a picture of Bufkin and argued that the wounds in the picture simply did not support the story of Batchelor shooting Bufkin in the back.

I

Batchelor first alleges that the State discriminated by excluding three black jurors during four peremptory challenges. He contends that the State did not meet its burden of establishing race-neutral reasons for excluding black jurors.

The State maintains that Batchelor waived this issue by failing to preserve an adequate record so that a reviewing court could determine whether discrimination occurred. *People v. Mitchell* (1987), 163 Ill. App. 3d 58, 69, 516 N.E.2d 500.

We find *Mitchell* to be distinguishable from the instant case. In *Mitchell*, the defendant failed to preserve any record about the racial makeup of the venire except the fact that one or more blacks had been excluded from the selected jury. In this case, defendant failed to preserve the makeup of the original venire, his own six peremptory challenges and the final two selected jurors. He did, however, preserve the record for the 10 jury members selected up to the point of his challenge and the four peremptory challenges made by the State. See, *e.g.*, *People v. Mays* (1988), 176 Ill. App. 3d 1027, 1045, 532 N.E.2d 843.

Furthermore, Illinois policy and law on waiver apply the plain-error rule "where the record clearly shows *** an alleged error affecting substantial rights." (*People v. Young* (1989), 128 Ill. 2d 1, 46, 538 N.E.2d 461; see also 107 Ill. 2d R. 615(a).) This rule serves the dual purposes of "correcting serious injustices" and preserving "the integrity and reputation of the judicial process." *Young*, 128 Ill. 2d at 46.

We will review the *Batson* issue here because the right to an unbiased jury is so intimately related to justice and the integrity of the court system that we will not consider it waived simply because the defendant failed to preserve all relevant details for review.

In *Batson v. Kentucky* (1986), 476 U.S. 79, 82, 90 L. Ed. 2d 69, 77, 106 S. Ct. 1712, 1714-15, the Supreme Court examined "the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the petit jury."

▇ First, the defendant must make out a *prima facie* case by showing that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Batson*, 476 U.S. at 94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1721, citing *Washington v. Davis* (1976), 426 U.S. 229, 239-42, 48 L. Ed. 2d 597, 607-09, 96 S. Ct. 2040, 2047-49.) To establish his *prima facie* case, the defendant: (1) must show that he is a member of a cognizable racial group; (2) must demonstrate that the prosecutor exercised his peremptory challenges to remove members of the group; (3) may rely on the fact that peremptory challenges constitute a jury selection practice which permits discrimination by those "who are of a mind to discriminate"; and (4) must show "that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; see also *People v. Mahaffey* (1989), 128 Ill. 2d 388, 412-13, 539 N.E.2d 1172.

The relevant circumstances for a *prima facie* showing of racial exclusion include but are not limited to: a disproportionate use of peremptory challenges against blacks; the absence of any common traits among the excluded blacks except their race; and the race of the defendant, the victim, and the witnesses. (*Mahaffey*, 128 Ill. 2d at 413.) Mere numbers do not establish the *prima facie* case. Nor does the fact that a trial court invited the State to give reasons for the questioned challenges. (*Mahaffey*, 128 Ill. 2d at 414.) Furthermore, racial issues in jury selection are minimized when both the defendant and victims are black. *People v. Holman* (1989), 132 Ill. 2d 128, 177, 547 N.E.2d 124.

If a court has determined that the defendant failed to meet his *prima facie* burden, this finding will not be overturned unless it is against the manifest weight of the evidence. *Mahaffey*, 128 Ill. 2d at 413, citing *People v. Evans* (1988), 125 Ill. 2d 50, 71, 530 N.E.2d 1360.

■ Once the defendant has met his *prima facie* burden, the burden shifts and the State must demonstrate that " 'permissible racially neutral selection criteria and procedures have produced the monochromatic result.' " (*Batson*, 476 U.S. at 94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1721, quoting *Alexander v. Louisiana* (1972), 405 U.S. 625, 632, 31 L. Ed. 2d 536, 542, 92 S. Ct. 1221, 1226.) The prosecutor must show more than an intuitive judgment that black jurors will favor black defendants. Even so, his explanations "need not rise to the level justifying exercise of a challenge for cause." (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Instead, the prosecutor need only "articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 89, 106 S. Ct. at 1724.

The jury traits which may justify a peremptory challenge include but are not limited to: courtroom demeanor, employment status and type of job, connections with those who do criminal defense work, social relationships with judges and lawyers, age, status as renter or homeowner, and arrest record. (*People v. Mack* (1989), 128 Ill. 2d 231, 240-43, 538 N.E.2d 1107.) The State's use of one of these traits to exclude blacks is not race neutral if the State retains white veniremen having that same trait and there is no additional trait to distinguish the white veniremen who were retained from the black veniremen who were challenged. On the other hand, prosecutors usually challenge jurors because of a combination of traits, so that a trait which might justify exclusion of one juror might be acceptable in another who has a different combination of traits. *Mack*, 128 Ill. 2d at 239.

■ If a trial court has determined that the State met its burden in a *Batson* challenge, the appropriate standard for reviewing the trial court's ruling is whether the court's decision is against the manifest weight of the evidence. (*Mack*, 128 Ill. 2d at 238.) The *Mack* court noted that because " 'the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.' " *Mack*, 128 Ill. 2d at 238, quoting *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.

On appeal, Batchelor effectively concedes that the trial court did

not make an explicit finding about whether he had met his *prima facie* burden. Instead, Batchelor cites cases from other jurisdictions to argue that he met his burden by showing that three of the four peremptory challenges used by the State excluded blacks and, furthermore, that the court made an implicit finding when it inquired about the State's justification for these exclusions.

Under *Mahaffey*, neither mere numbers, especially the incomplete numerical count presented here, nor the fact that the trial court examined State rebuttal evidence is sufficient in itself for a *prima facie* finding. However, even if Batchelor did meet his initial burden, this court cannot find reversible error unless the State failed to meet its burden of rebuttal.

■ The State offered several reasons for the exclusion of each of the three black veniremen. These reasons included experience as a crime victim, having a convicted felon in the family, location of residence near the home of the defendant, having a son near defendant's age, courtroom demeanor, and previous experience on two felony juries.

Batchelor argues that these reasons were pretextual because selected white jurors had some of the same traits. The State points out that many of the so-called similar traits were actually different. For instance, some whites had daughters near the defendant's age whereas the blacks had sons. One white juror had been convicted of a misdemeanor offense, while the black juror's daughter was convicted of a felony. Furthermore, the combination of traits was important. The white male with the criminal record answered questions directly. The black woman whose daughter had a record did not always address the State's questions and fixed her eyes on the defendant even while she was being questioned.

For these reasons, we find that the State met its burden of providing racially neutral explanations for the peremptory challenges and this finding was not against the manifest weight of the evidence.

## II

Batchelor claims that the trial court deprived him of a fair trial when it: (A) granted the State's motion *in limine* to bar the defense from commenting, during either opening statement or cross-examination, about certain inculpatory statements made by Batchelor; (B) said in front of the jury that Batchelor could not impeach a witness simply by reading his noncontradictory answers from the transcript of the previous trial; and (C) submitted a photo of the dead victim to the jury.

## A

■ Motions *in limine* permit a party to obtain an order before trial which excludes inadmissible evidence and prohibits interrogation about such evidence. (*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 549, 416 N.E.2d 268.) These motions are encouraged in criminal cases to exclude collateral or extraneous matters. *People v. Clark* (1984), 129 Ill. App. 3d 374, 377, 472 N.E.2d 814.

These powerful motions must be granted with caution, however, because they carry the dangerous potential to unduly restrict the opposing party's presentation of its case. (*Reidelberger*, 83 Ill. 2d at 550.) See, for example, the cases cited by defendant: *People v. Brumfield* (1979), 72 Ill. App. 3d 107, 111-12, 390 N.E.2d 589 (the motion precluded the entire defense of involuntary intoxication); *People v. Williams* (1978), 60 Ill. App. 3d 529, 531-33, 377 N.E.2d 367 (the exclusion of 17 areas of evidence was overbroad and prohibited any meaningful opening statement by defendant, any showing of witness bias, and any challenge to witness credibility); and *People v. Richardson* (1977), 48 Ill. App. 3d 307, 309, 362 N.E.2d 1104 (the motion prohibited the defense from presenting evidence that the complaining witness wanted to withdraw his complaint or terminate prosecution).

In reviewing the grant of a motion *in limine*, a court must consider whether the motion unduly restricted the presentation of a case and whether all parties had "an accurate understanding of its limitations." (*Reidelberger*, 83 Ill. 2d at 550.) A reviewing court will not overturn a trial court's grant or denial of a motion *in limine*, however, unless there was "a manifest abuse of discretion." *People v. Downey* (1987), 162 Ill. App. 3d 322, 334, 515 N.E.2d 362.

Batchelor contends that he was deprived of a fair trial because the court granted the State's motion *in limine* and ordered him to conduct his opening statement and cross-examination without reference to the three inculpatory statements which had been made by Batchelor, one of which had been made to Assistant State's Attorney (ASA) Semrow in the presence of a court reporter, and two of which were made to police detectives. The State had used these statements in the first trial but did not plan to use them in the second. This prohibition, he claims, precluded him from presenting the defense that these statements had been coerced. Additionally, if the court's order did not preclude presentation of direct examination evidence, it was inconsistent since it did exclude mention of the evidence in defendant's opening statement.

When the State offered its motion at trial, the court granted the

motion and told defendant "there is no need to comment on evidence that will not be offered in the case." Defense counsel Donald Hubert protested on the grounds that his client was being denied the right to "confront witnesses against him." The judge then pointed out that there would not be any witnesses testifying about the confessions, hence no need for confrontation. Hubert protested further that he wanted to go into "something wrong that happened at the police station relative to my client." The judge told him that there would "be no cross examination regarding evidence not offered." During this entire colloquy, Hubert never mentioned bringing in this evidence through direct examination of defense witnesses.

Prior to his own case in chief, Batchelor made a motion *in limine* to prohibit the State from using "reference to. any statements taken from my client." At that time, Hubert tried to clarify that "the Court has ordered me not to [make references to Batchelor's admissions to the ASA and the police], so that I am bound not to." The court replied: "I ordered you not to in opening statements." Hubert argued that the court's position was inconsistent because it prohibited references to evidence in opening statements but allowed the evidence in later. The court explained: "All that *** you have been precluded from doing is referring to what the state's evidence might have been. *** When the defense begins your defendant is not limited to what he can testify to. *** You can do anything you want with the statements if it's admissible within—."

■ At trial and on appeal, Batchelor argues that he was prevented from presenting important evidence for his case in chief. The short answer to this contention is that he was not. Even if Batchelor was confused after the State's motion *in limine*, the court clarified its position before the defense began its case in chief. In the court's words, Batchelor was "not limited to what he" could testify about "if it's admissible."

It is clear to us that the court, using these comments, did not preclude Batchelor from presenting any specific testimony or evidence. The court did not tell Batchelor what he could or could not introduce. It merely informed him that questions concerning admissibility would be addressed at the proper time.

Batchelor also contends that even if the court did eventually allow him to introduce this evidence, the court erred by changing direction in midtrial. In other words, he had been excluded from referring to evidence in his opening statement that he would introduce at trial and, therefore, he had been prevented from making a proper introduction to the jury for his theory at the trial. In support of this

theory, Batchelor argues that evidence of police coercion regarding his confession could lead to an inference that witnesses Joseph and Johnson may have suffered similar coercion forcing their testimony against Batchelor.

■ While Batchelor makes this argument on appeal, he never advanced it to the trial court. During the motion *in limine* conference, Hubert never addressed the admissibility of the evidence. From the record, it is clear that the gist of the first motion *in limine* conference was whether the defense, in its opening argument, could comment on evidence that the State did not intend to introduce. The trial court properly held that it could not. Thus, the court granted the State's motion for the legitimate purpose of limiting the opening statement to comments on evidence which would be presented in court. *People v. Thompkins* (1988), 121 Ill. 2d 401, 421-22, 521 N.E.2d 38.

Had Batchelor intended to present this evidence during the defense case in chief, he should have disclosed this fact to the court so the judge could have determined whether or not such evidence would be admissible. Furthermore, Batchelor made no attempt to use this evidence at trial either in his own direct examination or in cross-examination of other witnesses. These facts lead us to conclude that there was "no prejudice to defendant sufficient to constitute reversible error." *People v. Kline* (1982), 92 Ill. 2d 490, 504-05, 442 N.E.2d 154.

■ Finally, we do not accept the defense argument, citing *People v. O'Neal* (1984), 104 Ill. 2d 399, 407-08, 472 N.E.2d 441, that somehow the State waived its right to defend this issue on appeal because of possible misunderstandings and failures to clarify when the motion was originally made. In *O'Neal*, the State objected to a specific jury instruction at trial, did not raise the issue on appeal, and, finally, raised a different objection about jury instructions before the supreme court. Under those circumstances, the issue was waived. Here, by contrast, the State had no reason to raise an objection at trial when its understanding of the issue was, eventually, the same as the court's. Now, on appeal, the State is simply defending against a point raised by defendant.

For these reasons, we find that there was no error here.

## B

■ Parties may impeach a witness by using the witness' prior inconsistent statements. (*People v. Henry* (1970), 47 Ill. 2d 312, 320, 265 N.E.2d 876.) Such an inconsistency can occur through omission,

that is, "the omission of a witness to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would, state such fact, if true, may be shown to discredit his testimony as to such fact." (*Henry*, 47 Ill. 2d at 321.) For example, when a witness testifies at trial that an accident vehicle had only one headlight, he can be impeached by a transcript of inquest testimony in which he failed to mention this key fact (*Carroll v. Krause*, 295 Ill. App. 552, 560-62, 15 N.E.2d 323); or when a policeman testifies that an eyewitness knew the defendant and could identify him, counsel should be allowed to impeach the policeman by showing that he failed to include this information, which he would know was very important, in his report. *People v. Gonzalez* (1983), 120 Ill. App. 3d 1029, 1038, 458 N.E.2d 1047.

■■ The court may make comments which respond to defendant's arguments about impeachment in the presence of the jury. For example, the court can suggest that the impeachment effort is pure speculation (*People v. Harris* (1988), 123 Ill. 2d 113, 137, 526 N.E.2d 335) or that there is not enough discrepancy between the testimony and the attempted impeachment (*People v. Morgan* (1963), 28 Ill. 2d 55, 62-63, 190 N.E.2d 755). Furthermore, a trial court's comments do not constitute reversible error unless they "constituted a material factor in the conviction or were such that an effect on the jury's verdict was the probable result." *Harris*, 123 Ill. 2d at 137.

It is also within the court's discretion to question witnesses in an attempt to clarify points of testimony (*People v. Gross* (1988), 166 Ill. App. 3d 413, 422, 519 N.E.2d 1043) or eliminate confusion and curtail repetition (*People v. Wells* (1982), 106 Ill. App. 3d 1077, 1086, 436 N.E.2d 688).

Batchelor cites *Carroll* and *Gonzalez* and contends that the trial court erred when it refused to allow defense counsel Hubert to impeach Johnson by showing that he had not testified to all the details of Batchelor's admission at the first trial. According to Batchelor, the court compounded the error when it told the jury "[t]here was nothing impeaching here" and when it later rehabilitated Johnson.

At the second trial, Johnson testified that Batchelor told him about shooting Tyrone Bufkin as he "turned his back." During cross-examination, Hubert asked if "Randall told you that he shot Tyrone Bufkin in the back" and Johnson agreed. Hubert then read 13 questions and answers from the first trial to impeach Johnson by showing that he had not mentioned the shot "in the back" at the first trial. The court stopped Hubert on the grounds that the transcript answers did not contradict any important. points made by Johnson at

the second trial and, therefore, there was no impeachment.

■■■ It is true that Johnson did not say Batchelor had confessed to shooting the victim in the back at the first trial. As the court pointed out, however, he did not testify to that at the second trial either except to agree with a leading question by Hubert on cross-examination. In both direct examinations, Johnson simply told the court that Batchelor admitted shooting the victim when the victim was turned away. Unlike the policeman in *Gonzalez*, Johnson was not an experienced professional who failed to complete his first report properly. Unlike the witness in *Carroll*, Johnson did not spontaneously add details to his testimony at the second trial. Johnson was a teenager who phrased his facts in his own way on direct examination and allowed Hurbert to restate them on cross. Then Hubert based the impeachment on Johnson's response to the question on cross-examination. The ruling that "[t]here was nothing impeaching here" made in front of the jury simply stated the law as applied to Hubert's protracted impeachment attempt.

■■■ The record further shows that the court questioned Johnson to clarify a contradiction in his testimony concerning whether he was or was not a friend of Batchelor at the time of the shooting. In the course of this questioning, the court did suggest that Johnson "did not understand the question" when he first heard it and denied any friendship with the defendant. Nonetheless, Johnson was not fully rehabilitated because the implication remained that he either could not understand simple questions or he changed his answers to suit the occasion.

In addition, Johnson's testimony merely confirmed the testimony of Charles Joseph. This witness saw Walls and Batchelor in his home, helped hide the gun, and heard the same statements by Batchelor.

For the reasons above, we find that the trial court acted within its discretion in ruling on the impeachment of Johnson and in clarifying the existence of his friendship with Batchelor. Furthermore, even if error had occurred, Batchelor has not met his burden of showing that the alleged error was a material factor in his conviction, and, therefore, we would hold it harmless.

## C

■■■ The decision as to whether evidence should be taken into the jury room "rests within the discretion of the court, whose decision will not be disturbed absent a showing of prejudicial abuse." (*People v. Shum* (1987), 117 Ill. 2d 317, 353, 512 N.E.2d 1183.) Prejudicial abuse has been shown, for example, when the State reopened

its case just for the purpose of introducing a photo and the photo included autopsy incisions in addition to the wounds which caused death (*People v. Jackson* (1956), 9 Ill. 2d 484, 491, 138 N.E.2d 528), when the photo depicted a gruesome head wound and the defendant had already admitted the offense (*People v. Garlick* (1977), 46 Ill. App. 3d 216, 224, 360 N.E.2d 1121), and when the photos depicted grisly autopsy details without shedding light on a disputed issue (*People v. Fierer* (1987), 151 Ill. App. 3d 649, 657, 503 N.E.2d 594; *People v. Phillips* (1987), 159 Ill. App. 3d 142, 149, 512 N.E.2d 734). Photographs of the dead victim are permitted, however, to show the condition of the victim after the crime. *People v. Kubat* (1983), 94 Ill. 2d 437, 494-95, 447 N.E.2d 247; *People v. Williams* (1983), 97 Ill. 2d 252, 290-91, 454 N.E.2d 220.

Batchelor argues that the State inflamed the passions of the jury by allowing the jury to have a "death photo at the morgue." Defendant cites *Phillips, Fierer,* and *Garlick* to argue that the probative value of a "macabre morgue photo" of Bufkin's dead face was greatly outweighed by its prejudicial effect.

In this case, the court allowed the jury to have a photo of Bufkin which had been taken after death but before the autopsy. Unlike the photos in the defendant's cases, the one used here did not depict autopsy incisions or any other gruesome wounds beyond those inflicted by the killer.

For these reasons, we hold that the court did not abuse its discretion in allowing the photograph of Bufkin to go to the jury.

### III

Defendant argues that the court erred when it gave Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981) (hereinafter IPI Criminal 2d), on "Accountability," and included with IPI Criminal 2d No. 7.02 an additional statement on accountability as an issue for proof. Defendant so argues because the State had conducted its case in chief with the theory that Batchelor was the principal.

For a conviction under an accountability theory, the State must prove that the defendant: "(1) solicited, aided, abetted, agreed or attempted to aid, another person in the planning or commission of the offense; (2) did so either before or during the commission of the offense; and (3) did so with concurrent, specific intent to promote or facilitate the commission of the offense. [Citations.]" *People v. Calvillo* (1988), 170 Ill. App. 3d 1070, 1076, 524 N.E.2d 1054; see also Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).

Accountability requires more than mere presence at the scene or

knowledge that a crime is being committed (*People v. Owens* (1975), 32 Ill. App. 3d 893, 895, 337 N.E.2d 60), but does not require full, active participation in the offense (*People v. Bolden* (1978), 59 Ill. App. 3d 441, 449, 375 N.E.2d 898). One can be "held accountable if he attaches himself to a group which commits an unlawful act to which it appears all assented." (*People v. Ivy* (1979), 68 Ill. App. 3d 402, 405, 386 N.E.2d 323.) Flight from the scene of the crime is not a culpable action, but may be evidence tending to show guilt if flight appears motivated by the desire to avoid capture. *Ivy*, 68 Ill. App. 3d at 405.

■■■ Although submission of an instruction on accountability in the absence of supporting evidence is error (*People v. Banks* (1962), 26 Ill. 2d 259, 262, 186 N.E.2d 338), it is proper to instruct the jury on principal action and accountability where the evidence supports both theories. (*People v. Lusietto* (1976), 41 Ill. App. 3d 205, 207, 353 N.E.2d 385, citing *People v. Stark* (1966), 33 Ill. 2d 616, 312 N.E.2d 503.) Evidence, however slight, on accountability along with evidence of action as a principal offender is sufficient to support both instructions regardless of whether both theories were advanced in the State's case in chief. *People v. Faysom* (1985), 131 Ill. App. 3d 517, 527-28, 475 N.E.2d 945.

Batchelor cites *Lusietto* and *People v. Umphers* (1971), 133 Ill. App. 2d 853, 858, 272 N.E.2d 278, for the propositions that accountability instructions should not be given when the evidence establishes that the defendant was a principal and that the State may not change its theory to one of accountability after the evidence is presented. In both of these cases, however, the court found no evidence to support an accountability theory. Thus, the cases do not negate the rule that instructions may be given if there is some evidence, however slight, to support the theory. See, *e.g.*, *People v. Jarvis* (1987), 158 Ill. App. 3d 415, 430-41, 511 N.E.2d 813; *Faysom*, 131 Ill. App. 3d at 527.

■■■ At Batchelor's trial, the State presented evidence to show that he was carrying a gun in the company of Walls and Bufkin shortly before Bufkin was shot, that two people fled from the scene after the shooting, and that Batchelor left a gun, which proved to be the murder weapon, with Joseph and Johnson in the Joseph home. In defense, Batchelor admitted he was present when the murder occurred but blamed his codefendant for committing it. Since Batchelor had a gun before the shooting, there is some evidence for a theory of accountability in which he gave the gun to Walls who, in turn, committed the murder with his assent. The fact that Batchelor fled with

Walls and later gave the gun to others to hide adds some plausibility to the theory that his help began before the crime occurred.

For these reasons, we hold the court did not commit error in giving instructions on accountability. Furthermore, error would have been harmless because sufficient evidence exists to find Batchelor guilty as a principal. See *People v. Dukett* (1974), 56 Ill. 2d 432, 451, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226, citing *People v. Clements* (1963), 28 Ill. 2d 534, 540, 192 N.E.2d 923; *Faysom*, 131 Ill. App. 3d at 528; *Lusietto*, 41 Ill. App. 3d at 208.

## IV

Batchelor claims that the State deprived him of a fair trial by making improper remarks during closing argument.

Prosecutors have wide latitude to comment on evidence and draw reasonable inferences therefrom and, absent a clear abuse of discretion, a court's rulings on the propriety of these comments will not be disturbed on review. (*People v. Rockman* (1986), 144 Ill. App. 3d 801, 813, 494 N.E.2d 688.) Prosecutors may not, however, misstate facts or argue facts not in evidence. (*People v. Beier* (1963), 29 Ill. 2d 511, 516, 194 N.E.2d 280.) Even so, these remarks do not mandate a reversal "unless they are so prejudicial as to constitute a material factor in defendant's conviction." *People v. Townsend* (1985), 136 Ill. App. 3d 385, 394, 483 N.E.2d 340, citing *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

Batchelor contends that the State made three improper remarks which, cumulatively, amount to reversible error (citing *People v. Whitlow* (1982), 89 Ill. 2d 322, 337-43, 433 N.E.2d 629). First, the State referred to the absence of Ricky Walls at the trial even though the State had excluded him from the courtroom earlier. Second, the State made a remark about Dr. Kalelkar's testimony which, defendant argues, suggested that the defense had been hiding the evidence or trying to confuse the jury. Finally, the State referred to accountability in closing even though accountability was not the State theory of the case.

The State notes that defendant failed to make contemporaneous objections and thus failed to preserve the second and third issues for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.) In this case it does not appear that "the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial or sentencing hearing. [Citations]." (*People v. Young* (1989), 128 Ill. 2d 1, 47, 538

N.E.2d 461.) Thus, the plain-error exception to the waiver rule does not apply.

▮▮▮ Even assuming *arguendo* that the last two remarks were not waived by defendant's failure to make a contemporaneous objection, the State's closing did not exceed the latitude for drawing reasonable inferences from trial testimony. The State did refer to possible confusion over Dr. Kalelkar's testimony. The prosecutor who introduced a summary of her testimony began by saying: "Remember when Dr. Kalelkar left the witness stand and drew some pictures to show you how bullets traveled? She told you, you might be confusing them, let me explain it." He then went on to discuss Kalelkar's testimony. Thus, any suggestion that the defense had confused the jury or hidden evidence was contained in the comment made by Kalelkar herself and paraphrased by the prosecutor in closing. Furthermore, the State's remarks about accountability were proper comments about a theory supported by evidence.

The other alleged error in the State's closing was a statement about the absence of Ricky Walls at the trial. This remark was in rebuttal to the defense closing, which had suggested that Walls was the killer. Even if the State's remark was improper, any prejudicial effect was eliminated by instructions reminding the jury that Walls had been excluded from Batchelor's trial for legal reasons. *People v. Cisewski* (1987), 118 Ill. 2d 163, 178, 514 N.E.2d 970, citing *People v. Carlson* (1980), 79 Ill. 2d 564, 577, 404 N.E.2d 233.

In addition, defendant has not shown that any of these remarks, singularly or cumulatively, resulted in substantial prejudice or constituted a material factor in his conviction. (*People v. Morando* (1988), 169 Ill. App. 3d 716, 733, 523 N.E.2d 1061.) Therefore, any error would have been harmless.

For these reasons, we hold the State did not commit reversible error during the closing argument.

## V

Batchelor contends that the trial court erred when it refused to submit a written answer to a note from the jury and send an additional paragraph of instructions about the point at which a crime ends under an accountability theory.

The State argues that defendant waived this issue on appeal by failing to tender written instructions (citing *People v. Huckstead* (1982), 91 Ill. 2d 536, 440 N.E.2d 1248; *People v. Underwood* (1978), 72 Ill. 2d 124, 378 N.E.2d 513). In this case, however, unlike the ones cited, the instructions involve answers to jury questions during

deliberations and the judge specifically told defense counsel that no further instructions should be written at that point. Therefore, the issue is not waived.

Under Illinois case law: "Where a jury has raised an explicit question on a point of law arising from the facts over which there is doubt or confusion, the court should attempt to clarify the question in the minds of the jury members." (*People v. Kucala* (1972), 7 Ill. App. 3d 1029, 1035, 288 N.E.2d 622.) However, the decision to give non-IPI instructions is "a matter for the discretion of the trial court." (*People v. Sanchez* (1986), 115 Ill. 2d 238, 282, 503 N.E.2d 277.) It is also a matter of discretion for the trial court to give additional instructions when the ones already tendered extensively detail the elements and definition of the offense. *People v. Glass* (1984), 128 Ill. App. 3d 869, 872, 471 N.E.2d 597.

Batchelor cites *Kucala* for the proposition that it is reversible error to fail to instruct the jury on the time frame during which accountability can occur. In that case, defendant and several others were involved in a flight with three men. At one point defendant acted either in self-defense or in the defense of a friend when he hit one of the men who had threatened the defendant and others with a knife. In the fracas, objects were thrown and blows were struck. Two of the men fled from the scene. Kucala and others pursued these two men and someone killed one of them. Under those circumstances, the trial court's refusal to tell the jury whether the forcible felony began with the acts of self-defense or with the later pursuit of two fleeing men was reversible error.

In the case here, by contrast, the original instructions defined accountability in terms of the defendant's actions "before or during the commission of an offense" which help in the "planning or commission of the offense." The jury requested additional instructions about whether the crime of murder ended with the shooting or with the hiding of the gun. The court then called the jury and told them to follow instructions as already given. In short, the court simply refused to repeat or elaborate upon previous unambiguous instructions after jury deliberations had begun.

For these reasons, we hold that the trial court did not err in refusing to give additional instructions to the jury.

## VI

Finally, Batchelor states that the trial court abused its discretion in sentencing him to 35 years' imprisonment because this sentence was excessive for a first offender given his good record and his reha-

bilitative potential.

Under Illinois law, murder carries a sentence of not less than 20 nor more than 40 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(a).) A reviewing court has the power to reduce sentences under Supreme Court Rule 615(b)(4), but should not alter a sentence on review unless the trial court has abused its discretion. 107 Ill. 2d R. 615(b)(4); *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.

■■ Batchelor argues that he should have received a shorter sentence. At the sentencing hearing, he presented childhood problems, including a father who died when he was two and a mother who began her Ph.D. program when he was 12. He also noted his past drug and alcohol use and his age (15 at the time of the crime) as reasons why he should receive a shorter sentence. He reviewed the problems of fatherless black males who often suffer self-hatred and low self-esteem and live in neighborhoods infested by gangs and drugs. The State stressed the callous violence with which Batchelor had gunned down a boyhood friend simply because the other boy was joining another gang. The court reviewed the presentence investigation. The court also stated that Batchelor chose to commit "murder of a very young boy for practically no reason at all. *** There is no reason not to impose the maximum sentence, except, perhaps, the defendant's age."

We hold that, under the circumstances, a sentence of 35 years for murder is not an abuse of discretion.

For these reasons, we affirm the judgment of the circuit court of Cook County. As part of our judgment, we grant the State's request and assess the defendant $50 as costs for this appeal and $25 for the costs of oral argument.

Judgment affirmed.

McNAMARA, and EGAN, JJ., concur.